IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TERESA BEYER, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) No. 20 C 1721 ) ) Judge Virginia M. Kendall |
| NAPLETON MOTOR CORP. et al., | ) ) |
| Defendants. | ) ) |

MEMORANDUM OPINION & ORDER

Plaintiff Teresa Beyer sued defendants Napleton Motor Corporation ("Napleton"), Midland States Bank, and Northwest Bank, stemming from her purchase of a used Jeep that had multiple mechanical problems after the purchase. (Dkt. 1). Defendant Midland States Bank failed to appear in this action, and the Court entered default against it. (Dkt. 44). Beyer pursues a Truth in Lending Act ("TILA"), 15 U.S.C. § 1638, claim against Defendant Napleton; and claims against Defendants Napleton and Northwest Bank for breach of express warranty; breach of implied warranty; the Illinois Consumer Fraud Act, 815 ILCS 505/2; and common-law fraud. (Dkt. 1). Defendants moved for summary judgment on all claims. (Dkt. 112, 114). For the following reasons, Napleton's Motion for Summary Judgment on Beyer's TILA claim is granted. Pursuant to 28 U.S.C. § 1367(c)(3) the Court declines to exercise supplemental jurisdiction over the remaining state-law claims against Napleton and Northwest Bank and dismisses these claims without prejudice.

## BACKGROUND

**A. The Jeep**

In September 2018, Teresa Beyer purchased a used 2017 Jeep Wrangler Unlimited 4x4 from a Napleton Motor Corporation ("Napleton") dealership in Rockford, Illinois. (Dkt. 148 ¶ 4). A previous owner had modified the Jeep's exterior appearance and interior mechanical systems before trading it in to Napleton. (Dkt. 148 ¶ 9). When appraising the Jeep for resale, Napleton considered its extensive modifications and many aftermarket installations. (Dkt. 159 ¶ 2). Napleton offered to sell the Jeep to Beyer for $59,992, plus reconditioning and destination fee, and 3 month/3,000 miles limited warranty for $885, for a total price of $60,877. (Dkt. 148 ¶ 10).

Napleton told Beyer the Jeep was a trade-in, (Dkt. 148 ¶ 12), and she set up a test drive with a Napleton salesperson. (Dkt. 148 ¶ 13). During that test drive, Beyer felt a "pulling" when the Jeep drove on the road and asked the salesperson about it. (Dkt. 148 ¶ 13). She also knew the Jeep had at least one custom feature—tires—from its appearance. (Dkt. 148 ¶ 14). Beyer visited Napleton several times to drive and discuss the Jeep before purchasing it, along with additional optional coverages. (Dkt. 148 ¶¶ 14–15). These coverages included: a service contract called The Mechanic ("service contract"); Guaranteed Asset Protection ("GAP") coverage for vehicle repair or replacement in case of theft or accident; Luxcare XT, a treatment to protect the Jeep's exterior and interior; Vehicle Sentry Protection, an additional warranty related to theft; and a "Three for One" protection plan for the Jeep's tires, wheels, and windshield plus paint-less dent repair. (Dkt. 148 ¶¶ 16–21). The parties' dispute centers on the first of these optional coverages—the service contract.

Beyer signed several purchase documents with terms and conditions. Among them, the Buyers Order and Invoice contained a "Used Vehicle Disclaimer," which stated above her signature:

> I CERTIFY THAT I HAVE EXAMINED THIS AUTOMOBILE AND THE TREAD OF THE TIRES IS IN EXCESS OF 3/32 INCHES AS REQUIRED BY THE STATE OF ILLINOIS. I FURTHER UNDERSTAND THIS VEHICLE IS SOLD AS IS WITHOUT WARRANTY OF ANY KIND EITHER EXPRESS OR IMPLIED.

(Dkt. 148 ¶ 24; Dkt. 116-5 at 1). The Buyers Order and Invoice also included a "Warranty Disclaimer":

> The factory warranty constitutes all of the warranties with respect to the sale of this item/items. The Seller hereby expressly disclaims all warranties, either express or implied, including any implied warranty of merchantability or fitness for a particular purpose, and the Seller neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of this item/items.

(Dkt. 159 ¶ 6; Dkt. 116-5 at 1). The Buyers Order and Invoice does not show whether this Warranty Disclaimer applied to this purchase, (Dkt. 159 ¶ 6), none of the boxes are checked amongst the three options of: "DISCLAIMER DOES APPLY," "DISCLAIMER DOES NOT APPLY," or "AS IS; this vehicle is sold 'as is' by us." (Dkt. 159 ¶ 6; *see also* Dkt. 116-5 at 1). A 2017 Jeep normally has a factory warranty of 36 months/36,000 miles. (Dkt. 159 ¶ 7).

Beyer also signed a retail installment contract, (Dkt. 116-4 at 21–25), detailing the Jeep's purchase price, her trade-in information, her down payment, and the amount financed. (Dkt. 148 ¶ 22; Dkt. 116-4 at 21–22). The retail installment contract stated Illinois's statutory used-car warranty, 815 ILCS 505/2L. (Dkt. 159 ¶ 5; Dkt. 116-4 at 21). She signed the "Rider to Retail Installment Sales Contract" that repeated the Illinois Implied Warranty of Used Cars and included Napleton's 3 month/3000 Mile Used Car Powertrain Warranty. (Dkt. 148 ¶ 22; Dkt. 116-5 at 34). She also signed the "Used Vehicle Limited Implied Warranty of Merchantability

3

for Powertrain Components," (Dkt. 148 ¶ 25; Dkt. 116-5 at 35), which listed on the following page many major defects that may occur in used vehicles. (Dkt. 148 ¶ 25; Dkt. 116-5 at 36). Napleton assigned the retail installment contract to Midland States Bank, which provided Beyer's financing for the purchase. (Dkt. 142 ¶¶ 7–8).

### B. The Service Contract

Beyer wanted complete warranty protection on the Jeep. (Dkt. 159 ¶ 8). Before purchasing, Napleton gave Beyer an extended warranty brochure accompanying the service contract. (Dkt. 159 ¶¶ 8–9; Dkt. 149 ¶ 23). The brochure stated, "Aftermarket accessories or equipment, components and systems not installed by the manufacturer . . ." were not covered by the service contract. (Dkt. 149 ¶ 23; Dkt. 159 ¶ 9). It also stated, "The list of exclusions is minimal and consists mostly of maintenance related items . . . you will find Platinum provides comprehensive coverage for your vehicle and protects you from unexpected and expensive auto repair bills." (Dkt. 159 ¶ 9). While discussing the service contract's coverage on the Jeep with Beyer, Napleton employee Charles Madison wrote out:

1) 5 year + <u>60000</u> B-Bumper
2) GAP
3) Wheel + Tire

(Dkt. 159 ¶ 12; Dkt. 116-5 at 39). Madison testified that "B-Bumper" refers to "bumper-to-bumper" and "that would be the platinum warranty." (Dkt. 159 ¶ 12). Napleton gave Beyer the full terms and conditions of the service contract and its coverage exclusions, which she signed when she purchased the Jeep and the service contract. (Dkt. 149 ¶ 16). She did not read each document line-by-line before signing. (Dkt. 116-2 at 243:16–21).

4

### C. Car Trouble

About a month later, the Jeep's ABS and traction-control light came on. (Dkt. 147 ¶ 26; Dkt. 159 ¶ 16). On Napleton's instruction, because "their warranty was good over at Anderson's," she took it in to Anderson Chrysler Jeep ("Anderson") in Rockford for an inspection that determined a speed sensor wire was stretched. (Dkt. 147 ¶ 26). The repair did not qualify for coverage under either the factory warranty or Beyer's service contract, (Dkt. 159 ¶ 17), though Beyer and Napleton disagree on the reason Napleton gave at the time for the warranty exclusion. (Dkt. 147 ¶ 26; Dkt. 159 ¶ 17). Napleton reimbursed Beyer $301.08 for the repair. (Dkt. 147 ¶ 26). Beyer took the Jeep back to Anderson for an oil change in mid-November, and she made no complaint to Anderson or Napleton about the Jeep's performance in the intervening month. (Dkt. 147 ¶ 27). She then stored the Jeep from November until March 2019. (Dkt. 147 ¶ 28).

In March 2019, Beyer began driving the Jeep again and had mechanical issues. (Dkt. 147 ¶ 29). She took it back to Anderson, where she learned the Jeep's rear differential's internal components had to be replaced at a total cost of $3,099.11. (Dkt. 159 ¶ 19). Neither the factory warranty nor the service contract would cover the replacement cost, (Dkt. 159 ¶ 19), because they related to aftermarket products installed. (Dkt. 147 ¶ 30). Beyer went to Napleton to talk to the dealership's general manager, Geoffrey Feinblatt. (Dkt. 159 ¶ 20). Napleton and Beyer dispute some of the content of Feinblatt's conversations with Beyer. (*See* Dkt. 147 ¶ 31; Dkt. 159 ¶ 20). But both admit Feinblatt agreed with Beyer to split the repair cost with her, with Napleton paying $1,000, Napleton asking Anderson to reduce the bill by $500, and requiring Beyer to pay the $1,600 difference. (Dkt. 159 ¶ 20). Beyer didn't have $1,600. (Dkt. 159 ¶ 21). She contends she told Feinblatt she wanted to return the Jeep at that point but was refused. (Dkt. 159 ¶¶ 21–22,

5

*see* Dkt. 116-2 at 174:12–13, 177:18–178:8, 178:22–23). Napleton denies Beyer told Feinblatt she wanted to return the Jeep in any written correspondence, without addressing their oral conversations. (Dkt. ¶ 21–22). In any event, Napleton did not take back the Jeep nor refund all Beyer's money but arranged an alternative to allow Beyer to access $1,600 via a credit transaction.

### D. May 2019 Credit Transaction on the Jeep

Napleton agreed to a credit transaction on the Jeep that would refund what Beyer had paid for the service contract—cancelling it—so Napleton could use $1,600 of that refund to pay Anderson's and credit the rest to Beyer as a "down payment" in what Feinblatt (and Napleton more generally) characterize as a refinancing arrangement for the Jeep. (Dkt. 159 ¶ 23). To complete the transaction, Napleton prepared a second Retail Installment Contract in May 2019 ("2019 Retail Installment Contract"), and Beyer signed it. (Dkt. 159 ¶ 25; Dkt. 116-15 at 1–2). Beyer disputes Napleton's characterization of the transaction as a "refinancing" but does not dispute the relevant numbers listed on the 2019 Retail Installment Contract: a trade-in valued at $50,000, a $1,600 lien payoff, and a total sale price of $62,830.25. (Dkt. 159 ¶ 25; Dkt. 116-15 at 1). The total sale price included fees for documents, ERT, title, and GAP coverage. (Dkt. 159 ¶ 25). The 2019 Retail Installment Contract makes Truth in Lending Act disclosures in a box at the top. (Dkt. 159 ¶ 32; Dkt. 116-15 at 1).

Napleton also prepared a second Buyers Order and Invoice/Used Vehicle Disclaimer ("Buyers Order"). (Dkt. 159 ¶ 27). The second Buyers Order differs from the first in that it (1) checked the box "AS IS," and included added language:

> This transaction is independent of all and any repairs to said vehicle, past present and future. Vehicle is sold as is shown. Teresa Beyer releases Napleton Motor Corp of all claims past present and future.

6

(Dkt. 159 ¶ 28). Feinblatt had Madison include this language on the form. (Dkt. 159 ¶ 29).

Napleton assigned the fully executed 2019 Retail Installment Contract to Northwest Bank. (Dkt. 142 ¶ 10). Beyer never spoke to Northwest Bank before executing the 2019 Retail Installment Contract with Napleton, (Dkt. 142 ¶ 12), and Northwest Bank never made any representations about the Jeep's condition or anything about its warranty coverage. (Dkt. 142 ¶¶ 13–15). Northwest Bank was not present during any conversations between Beyer and Napleton in May 2019. (Dkt. 142 ¶ 31). Northwest Bank provided financing to Beyer under the 2019 Retail Installment Contract's terms. (Dkt. 142 ¶ 16). Loan officer Pat Peterson at Northwest Bank approved the loan assignment for the 2019 Retail Installment Contract between Beyer and Napleton. (Dkt. 142 ¶ 28). Northwest Bank typically refinances used vehicles through a direct loan program, rather than the indirect loan program. (Dkt. 142 ¶ 33).

After completing this credit transaction, Napleton picked up the Jeep from Anderson and brought it back to the dealership to repair its running boards and rear brake light before returning it to Beyer. (Dkt. 142 ¶ 33).

### E. Additional Repairs and Final Sale

After the second credit transaction, Beyer encountered more problems in the following months with her Jeep and took it in for further repairs. (Dkt. 142 ¶¶ 34–35; Dkt. 159 ¶¶ 30–36). The factory warranty covered some, but not all, of the required repairs. (Dkt. 142 ¶¶ 34–35; Dkt. 159 ¶¶ 30–36). Most significantly, in October 2019, Beyer paid $2,880.57 to replace the transmission. (Dkt. 159 ¶ 37). The factory warranty did not cover this repair, because it related to the Jeep's modifications and aftermarket parts previously installed. (Dkt. 159 ¶ 36). While this lawsuit was pending, Beyer eventually sold the Jeep in November 2021 to a private buyer for $40,000. (Dkt. 159 ¶ 37).

**F. Procedural History**

Beyer filed her Complaint (Dkt. 1) against Napleton, Midland States Bank, and Northwest Bank in March 2020. She claimed Napleton violated the Truth in Lending Act, 15 U.S.C. § 1638 and its implementing regulation 12 C.F.R. § 1026.18, in the 2019 Retail Installment Contract. (Dkt. 1 at 7). She also brought claims against Napleton, Midland States Bank, and Northwest Bank for a breach of express warranty; a breach of implied warranty; violations of Illinois's Consumer Fraud Act, 815 ILCS 505/2; and common-law fraud. (Dkt. 1 at 7–11). Midland States Bank failed to answer, and the Court granted Beyer's motion for entry of default against Midland States Bank in October 2020. (Dkt. 42–44). Napleton and Northwest Bank now move for summary judgment on all claims. (Dkt. 112, 114).

## LEGAL STANDARD

Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022); *see* Fed. R. Civ. Pro. 56(a). If a reasonable jury could return a verdict for the nonmoving party, summary judgment is inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-moving party must "respond to the moving party's properly-supported motion" with "sufficient evidence favoring the non-moving party to permit a trier of fact to make a finding in the non-moving party's favor as to any issue for which it bears the burden of proof." *Weaver*, 28 F.4th at 820 (citing *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017)).

## DISCUSSION

**A. Waiver of Liability Under Magnuson Moss Act**

Beyer contends this Court has federal-question jurisdiction over this action pursuant to the Magnuson Moss Act ("MMA"), 15 U.S.C. § 2310,[1] (Dkt. 1 at 1), which grants a consumer "who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract," the right to file an action in district court. 15 U.S.C. § 2310(d)(1). But Beyer never alleges an MMA violation in her Complaint. Her Complaint names the MMA only once as generally granting jurisdiction. (Dkt. 1 at 1). Beyer does not allege any theory of liability arising under the MMA until her brief in opposition to Napleton's Motion for Summary Judgment. (Dkt. 147 at 7 (alleging Napleton's breach of implied warranty of merchantability for Jeep actionable under 15 U.S.C. § 2310(d)); *id.* at 8 (alleging Napleton's issuance of a service contract on the Jeep bars it from disclaiming implied warranties under 15 U.S.C. § 2308)).

Plaintiffs may not amend their Complaint "through allegations made in response to a motion for summary judgment." *Griffin v. Potter*, 356 F.3d 824, 830 (7th Cir. 2004); *see also Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."). Because Beyer failed to allege liability arising under the MMA until Napleton moved for summary judgment, she has waived any MMA claims. *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) (holding plaintiff waived claims he failed to assert in operative complaint but raised at summary judgment).

### B. TILA Claim Against Napleton

Congress enacted TILA "to assure a meaningful disclosure of credit terms" to give consumers necessary information to shop for credit and compare costs. *Beach v. Ocwen Fed.*

---

[1] On page 1 of the Complaint, Beyer claims jurisdiction under "15 U.S.C. § 2610 (Magnuson Moss Act)," (Dkt. 1 at 1), but the Court assumes this to be a typo, as the Magnuson Moss Act's jurisdictional provision is codified at 15 U.S.C. § 2310.

9

*Bank*, 523 U.S. 410, 412 (1998) (quoting 15 U.S.C. § 1601(a)). Under TILA, retail installment contracts for closed-end credit transactions—like auto loans—must provide accurate disclosures of the credit contract's material terms, specifically, the annual percentage rate of interest (APR), the finance charge, the amount financed, the total of payments, and the total sale price. 15 U.S.C. § 1638(a); *Janikowski v. Lynch Ford, Inc.*, 210 F.3d 765, 767 (7th Cir. 2000). The Federal Reserve Board (FRB) has promulgated "Regulation Z" to define the content of required TILA disclosures. 15 U.S.C. § 1604; 12 C.F.R. Part 1026.

Beyer's TILA claim against Napleton centers on the second credit transaction, documented in the 2019 Retail Installment Contract. She challenged the accuracy of several material terms, alleging the "finance charges and annual percentage rate were understated," (Dkt. 1 at 7), and "the numbers for the down payment, cash price, and total sale price were totally fictitious" (Dkt. 1 at 6), violating TILA's disclosure requirements under 15 U.S.C. § 1638 and 12 C.F.R. § 1026.18.

To evaluate whether there remains genuine dispute as to a material fact that any of the required disclosures on the 2019 Retail Installment Contract between Beyer and Napleton were inaccurate and thus violated TILA, the Court must look to the express language of the statute and regulations defining each term. *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 560 (1980) ("[I]nterpretation of TILA and Regulation Z demands an examination of their express language."). The FRB Staff Commentary to TILA's regulations also guides the Court confronted with an alleged TILA violation. *Hamm v. Ameriquest Mortg. Co.*, 506 F.3d 525, 528 (7th Cir. 2007); *see also Milhollin*, 444 U.S. at 565 (emphasizing appropriateness of deferring to FRB in construing TILA and Regulation Z).

1. **Finance Charge and Annual Percentage Rate (APR)**

TILA requires lenders to disclose the "finance charge, using that term, and a brief description such as 'the dollar amount the credit will cost you.'" 12 C.F.R. § 1026.18(d). This finance charge must be expressed as an "annual percentage rate." 15 U.S.C. § 1638(a)(4). The 2019 Retail Installment Contract contains a box at the top of the page, which clearly states the "Finance Charge the dollar amount the credit will cost you" as $11,058.44 and the APR as 6.69%. (Dkt. 116-15; Dkt. 148 ¶ 32). The APR on the 2019 Retail Installment Contract matches the APR shown on contract assignee Northwest Bank's payment ledgers. (Dkt. 116-11). Beyer provided no evidence to show Napleton "inflated" the finance charge or APR, conceding as much in her brief by failing to address it. (*See* Dkt. 147 at 17 ("Napleton claims that it complied with TILA because 'Within that box the document [*sic*] Napleton listed the TILA required information, including the annual percentage rate ('APR') and finance charges." Nap. Mem., p. 4. However, the disclosure requirements are not limited to the APR and finance charge.")). The parties ultimately do not dispute the accuracy of the APR and finance charge on the 2019 Retail Installment Contract.

**2. Whether the May 2019 Transaction Was a "Credit Sale"**

Several of the TILA disclosures Beyer challenges incorporate the term "credit sale," and Beyer alleges many of these disclosures were "fictitious" because she maintains no "credit sale" took place. (Dkt. 1 at 6; Dkt. 147 at 3). She argues, "In 'refinancing' the Jeep, Napleton made a loan but documented the transaction as a credit sale." (Dkt. 147 at 17).

As a preliminary matter, Napleton claims that Beyer's challenge of the characterization of this transaction as a credit sale was improperly raised at summary judgment. (Dkt. 156 at 12). But Beyer raises this issue in her Complaint. (Dkt. 1 at 6 ("The numbers for the down payment, cash price, and total sale price were totally fictitious, there being no 'credit sale.'")). Although

the Complaint never alleges Napleton owed Beyer different affirmative loan disclosures under TILA for this transaction other than those TILA requires for a credit sale. The Court thus restricts its analysis to whether this transaction could properly be considered a "credit sale" under TILA and Regulation Z, such that the disclosures provided were appropriate to the transaction. Then, the Court will analyze whether the evidence shows any genuine dispute of material fact as to the accuracy of the disclosures made under the terms.

Regulation Z defines "credit sale" as simply "a sale in which the seller is a creditor." 12 C.F.R. § 1026.2(a)(16). The FRB Staff Commentary interpretation of 2(a)(16) Credit Sale in Supplement I provides additional guidance on credit sales that also involve refinancing existing obligations: "Generally, when a credit sale is refinanced within the meaning of § 1026.20(a), loan disclosures should be made. However, *if a new sale of goods or services is also involved, the transaction is a credit sale*." (Emphasis added). Here, it is undisputed that the primary subject of the credit transaction is the 2017 Jeep, and both Napleton and Beyer in her testimony referred to "refinancing" it in general terms. (Dkt. 159 ¶ 23; Dkt. 116-2 at 189:19–193:20 (referring to the credit transaction as "refinancing")). It is also undisputed that part of this credit transaction included a deal to pay for the repairs at Anderson. (Dkt. 159 ¶¶ 20, 23). It is not a stretch to understand this deal as involving new goods and services in addition to the refinance of the Jeep. The arrangement to pay for the repairs was material to the new credit transaction. It allowed Beyer to access $1,600 by using a refund on her service contract, while Napleton agreed to pay $1,000 directly for the repair and ask Anderson to reduce the cost by another $500, covering the full $3,099 repair cost. (Dkt. 159 ¶¶ 19–20). This understanding of the full context of the credit transaction is consistent with the plain language of Regulation Z and its

12

accompanying FRB Commentary describing a "credit sale" that involves both refinancing an existing obligation and the sale of new goods or services.

It is appropriate next to define each of the challenged disclosure terms in the context of a credit sale and analyze whether the evidence shows any genuine dispute of material fact as to the accuracy of the disclosures made under the required disclosure terms.

### a. Down Payment

Regulation Z defines "Downpayment" as "an amount, including the value of property used as a trade-in, paid to a seller to reduce the cash price of goods or services purchased in a credit sale transaction." 12 C.F.R. § 1026.2(a)(18). Setting aside for a moment the definition of "cash price," the 2019 Retail Installment Contract lists $5,229.00 as a "Cash Downpayment" and then subtracts $1,600 off from the Net Trade for a Total Downpayment of $3,629.00. (Dkt. 116-15). Though Beyer characterizes these figures as "totally fictitious" (Dkt. 159 ¶¶ 25–26; Dkt. 1 at 6, 7; Dkt. 147 at 17), General Manager Geoffrey Feinblatt's undisputed testimony explained that the transaction would treat the Jeep as a trade-in, refund the full value of the service contract (also referred to as the extended warranty), and use that amount as a down payment in the new credit transaction, with $1,600 of the $5,229.00 refund to pay for the repair at Anderson. (Dkt. 159 ¶ 23).

In corroboration, the second Buyer's Order that Beyer signed at the same time as the 2019 Retail Installment Contract lists "$5,229.00" as Partial Payment, less $1,600.00 as a value of equity in the vehicle as a trade-in, for a total down payment of $3,639.00 to offset the total price of the vehicle's purchase and financing. (Dkt. 116-5 at 63). Beyer testified the breakdown of the numbers appearing on the Buyer's Order and Invoice were explained to her before executing the transaction, and she knew the $1,600 to pay Anderson would be taken out of the

13

value of the extended warranty refund, pro-rated to the time of the new transaction. (Dkt. 116-2 at 204:20–205:12). Napleton gave additional evidence Charles Madison discussed these amounts with Beyer over email several days before the transaction. (Dkt. 116-4 at 3–6).

Beyer provided no evidence to back up her claim the down-payment numbers were "fictitious," other than asserting this conclusion several times. (*See* Dkt. 1 at 7; Dkt. 147 at 3, 17). In opposing a defendant's motion for summary judgment, "the plaintiff is not . . . relieved of his own burden of producing in turn evidence that would support a jury verdict. . . . Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986). Beyer has produced no evidence to overcome Napleton's statements regarding the accuracy of the down payment disclosure in the credit transaction and what it represented.

**b. Cash Price**

Regulation Z defines "Cash price" as

> the price at which a creditor, in the ordinary course of business, offers to sell for cash property or service that is the subject of the transaction. At the creditor's option, the term may include the price of accessories, services related to the sale, service contracts and taxes and fees for license, title, and registration. The term does not include any finance charge.

12 C.F.R. § 1026.2(a)(9). The "property" that is subject of the transaction is the 2017 Jeep, which Napleton provided evidence it took back into stock as a trade-in by assigning it a new stock number of 6105, shown on the 2019 Retail Installment Contract, (Dkt. 115 at 3; Dkt. 116-15 at 1), and on the Buyers Order. (Dkt. 116-5 at 64).[2] The cash price for the 2017 Jeep listed on

---

[2] Beyer simultaneously claims the 2019 Retail Installment Contract "purports to treat the [2017] Jeep as being both traded in and again purchased" and that the contract also shows "a trade-in of a 2016 Jeep valued at $50,000." (Dkt. 159 ¶ 25). This is internally inconsistent. The 2019 Retail Installment Contract does not refer to the year of the trade-in. (*See* Dkt. 116-15 at 1). It refers only to the purchase of a used 2017 Jeep. (*Id.*). Likewise, the Buyers Order does not reference the year of the vehicle valued as a trade-in. (*See* Dkt. 116-5 at 64). Thus, the only consistent way to interpret Beyer's claim is that the 2019 Retail Installment Contract shows the 2017 Jeep as traded in and repurchased.

the 2019 Retail Installment Contract is $50,650.00, (Dkt. 116-15), which matches the "Selling Price as Equipped" on the accompanying Buyer's Order. (Dkt. 116-5 at 64).

The "Total" on the Buyers Order (which is not a TILA term, but rather an optional itemization of the additional cost of the sale including the $25.00 ERT Fee, $120 license and title fee, $179.81 documentary service fee) then becomes $50,974.81 including those fees incorporated into all vehicle transactions at Napleton. (Dkt. 116-5 at 64). Minus the $3,629 cash down payment, the Buyers Order shows the unpaid cash balance to be financed as $47,345.81—which would first appear to differ from the Amount Financed on the 2019 Retail Installment Contract, listed there as $48,142.81. (Dkt. 116-15 at 1). But Beyer opted to add financed GAP insurance in this transaction at a cost of $797.00. (*See* Dkt. 116-5 at 86 (Beyer email to Charles Madison: "I decided to go with the gap.")). With the additional cost of GAP insurance, the total Cash Price for the value of the goods and services that are subject to the transaction—the 2017 Jeep, including a $1,600 payoff to Anderson for its repair—accurately represents the Amount Financed, less Total Other Charges & Amount Paid to Others, less the Unpaid Balance Cash Price, plus the cash down payment. Again, Beyer claims this is all "fictitious" but has not provided supporting evidence or explanation to back up this conclusion. She thus fails to meet her burden to contest Napleton's evidence supporting the numbers' accuracy. *Anderson*, 477 U.S. at 256–57.

    c. **Total Sale Price in a Credit Sale**

Regulation Z requires a specific disclosure in a credit sale:

> The total sale price, using that term, and a descriptive explanation (including the amount of any downpayment) such as "the total price of your purchase on credit, including your downpayment of $\_\_\_." The total sale price is the sum of the cash price, the items described in paragraph (b)(2), and the finance charge disclosed in paragraph (d) of this section.

15

12 C.F.R. § 1026.18(j). The box at the top of the 2019 Retail Installment Contract lists: "Total Sale Price The total cost of your purchase on credit, including your downpayment of $3,629.00 [=] $62,830" (Dkt. 116-5 at 1). The amounts disclosed for the "Downpayment," "cash price," and "finance charge" and their accuracy are discussed above. Paragraph (b) of § 1026.18 requires disclosure of the "Amount financed," including: "[a]dding any other amounts that are financed by the creditor and are not part of the finance charge." 12 C.F.R. § 1026.18(b)(2). Here, this includes fees associated with a vehicle purchase, plus the GAP insurance Beyer decided to include, (Dkt. 116-5 at 86). This comes to $1,121.81. The Cash Price ($50,650.00) minus Cash downpayment ($5,229.00) plus lien payoff ($1,600.00) gives the Unpaid Balance of the Cash Price: $47,021.00. The "paragraph (b)(2)" fees then are added in: $797.00 for GAP insurance, $120.00 for license/title, $25.00 for ERT fee, $179.81 document fee, comes to $1,121.81 of "paragraph (b)(2) fees." This sum added to the $47,021 Unpaid Balance of the Cash Price comes to $48,142.18, representing the Amount Financed pursuant to 12 C.F.R. § 1026.18(b). Then, adding in the Finance Charge of $11,058.44, the Total of Payments reflects $59,201.25, and adding back in the Down Payment of $3,629.00, the Total Sale Price comes to $62,830.25. (Dkt. 116-5 at 1).

On the face of this document, each required disclosure for a credit sale is properly made, and no inaccuracies exist as to the amounts disclosed. Without bringing forth specific evidence contradicting these disclosures' accuracy, Beyer fails to meet her burden to show Napleton violated TILA. *Anderson*, 477 U.S. at 256–57.

\* \* \*

Regardless of the lay terminology used when the transaction was consummated, the parties agree that in May 2019, Napleton extended a new line of credit to Beyer in the amount of

$48,142.81 using a credit sale as the loan mechanism. This would pay off lienholder Midwest Bank, which provided the Jeep's original financing, and extend new financing to Beyer, lowering her monthly car payment. The credit's clearly disclosed APR was 6.69%, for a total finance charge of $11,058.44. (Dkt. 116-15 at 1). Napleton calculated the Itemization of Amount Financed by refunding Beyer's extended warranty valued as $5,229 and used this as a down payment toward Beyer's repurchase of her Jeep as a trade-in, less a lien payment of $1,600 to Anderson for the repairs of the Jeep. Beyer has not offered any evidence to support her assertion that the disclosed amounts were "fictitious" or to counter Napleton's evidence of their accuracy. A reasonable jury could not find Napleton violated its obligations under TILA in its clear and accurate disclosures of the terms of credit. *Rojas v. X Motorsport, Inc.*, 710 F.App'x 708, 710 (7th Cir. 2018) (rejecting alleged TILA violation when plaintiff received all mandated financing information and failed to present evidence of inaccuracy); *see also, e.g.*, *Williams v. Lynch Ford, Inc.*, No. 03 C 5830, 2004 WL 2997508 (N.D. Ill. Dec. 23, 2004) ("[A]utomobile dealers and other creditors shall be held liable for violating the TILA only for defects that are apparent on the face of the disclosure statement." (citation and internal quotation marks omitted)); *accord, e.g.*, *Frazee v. Seaview Toyota Pontiac, Inc.*, 695 F. Supp. 1406, 1408 (D. Conn. 1988) (no viable TILA claim where "plaintiff entered into a retail installment contract that plainly disclosed finance charges" and "[d]efendant complied with disclosure requirements of TILA").

Beyer has not alleged, nor do any facts in the record show, that the disclosures on the 2019 Retail Installment Contract caused Beyer to misunderstand how much credit Napleton (or Northwest Bank, as the contract's third-party assignee) was extending her, nor to pay more money to Napleton (or third-party assignee) on her refinanced auto loan than initially disclosed. Indeed, Beyer never objected to having $48,142.81 remaining to pay off her Jeep. She objected

generally to having to pay anything at all to Napleton for a vehicle she believed defective or for repairs she believed should have been covered under the various warranties she purchased. But this is not the harm against which TILA protects. TILA protects consumers against making uninformed decisions on taking out credit, not against the bad purchases the consumer makes with that credit. *See Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 364–65 (1973) ("The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of this [law] to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601); *see also Poulin v. Balise Auto Sales, Inc.*, 647 F.3d 36, 37–38 (2d Cir. 2011) ("Essentially, the complaint alleges that plaintiffs . . . received a bad bargain. But TILA is a disclosure statute, not a fair pricing law."). The Court grants Napleton's motion for summary judgment on Count I of Beyer's claim.

### C. Counts II-V Against Napleton and Northwest Bank

Having resolved the TILA claim in Napleton's favor, the remaining claims—breach of express warranty; breach of implied warranty; violations of Illinois's Consumer Fraud Act, 815 ILCS 505/2; and common-law fraud—are all Illinois state-law claims. "When federal claims drop out of the case, leaving only state-law claims, the district court has broad discretion to decide whether to keep the case or relinquish supplemental jurisdiction over the state-law claims." *RWJ Management v. BP Products North America, Inc.*, 672 F.3d 476, 478 (7th Cir. 2012). There is a "general presumption in favor of relinquishment." *Id.* This is a rebuttable presumption, "but it should not be lightly abandoned, as it is based on a legitimate and substantial concern with minimizing federal intrusion into areas of purely state law." *Id.*, quoting

*Khan v. State Oil Co.*, 865 F.2d 920, 923 (7th Cir. 1989). Some extraordinary circumstances may displace the presumption, such as

> (1) the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided.

*Id.* at 480.

Here, the Illinois statute of limitations for breach of warranty in a contract has not yet run. *See* 810 ILCS 5/2-725(1), (3) ("An action for breach of any warranty must be commenced within four years after the cause of action has accrued. . . . (3) Where an action commenced within the time limited by subsection (1) is so terminated as to leave available a remedy by another action for the same breach such other action may be commenced after the expiration of the time limited and within six months after the termination of the first action . . . ."). Nor has the Illinois statute of limitations for common-law fraud, which is for five years. *See* 735 ILCS 5/13-205. The statute of limitations for Beyer's claim under the Illinois Consumer Fraud and Deceptive Business Practices Act has run. *See* 815 ILCS 505/10a(e) (setting three-year statute of limitations). But declining to exercise pendent jurisdiction over state-law claims would still allow Beyer to seek remedies in contract or tort for three of them in state court. Illinois state courts are best suited to resolving state-law claims. *See Huffman v. Hains*, 856 F.2d 920, 923 (7th Cir. 1989) ("[R]espect for the state's interest in applying its own law, along with the state court's greater expertise in applying state law, become paramount concerns.").

Accordingly, the Court declines to exercise supplemental jurisdiction over the pendent state-law claims. 28 U.S.C. § 1367(3)(c). The Court grants Napleton's motion for summary judgment in Count I of Beyer's claims, and dismisses Counts II-V against Napleton and

Northwest Bank without prejudice, so Beyer may further pursue available remedies in state court.

_____
Virginia M. Kendall
United States District Judge

Date: September 13, 2022